RANDY S. GROSSMAN
United States Attorney
JENNIFER E. MCCOLLOUGH
Assistant United States Attorney
Texas State Bar No. 24099903
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-8773
Email: jennifer.mccollough@usdoj.gov

Attorneys for UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 20cr2670-BAS |
|---|---|
| v. | **UNITED STATES' SENTENCING MEMORANDUM** |
| ALFREDO BUENO VILLA, | Date: August 19, 2022<br>Time: 2:00 p.m. |
| Defendant. | The Honorable Cynthia Bashant |

The United States of America respectfully requests that the Court sentence Defendant Alfredo Bueno Villa to the mandatory minimum 120-month custodial sentence, followed by five years of supervised release, a $200 special assessment, and a $10,000 fine. Defendant has thus far failed to meet the criteria for Safety Valve, despite having the opportunity to do so. A 120-month sentence, though severe, is still well below the low-end of his United States Sentencing Guidelines range. This recommended sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense, provide adequate deterrence of such criminal conduct, and promote respect for the law.

//

## I.
## STATEMENT OF THE CASE

On July 22, 2021, Defendant was convicted after a jury trial on two counts of an indictment charging importation of methamphetamine and fentanyl, in violation of 21 U.S.C. §§ 952 and 960.

On March 10, 2022, United States Probation filed the Presentence Investigation Report (PSR). ECF No. 73. The PSR calculated Defendant's advisory Guideline range at 292-365 months.[1] (*Id.* at ¶¶ 33 and 95.) The PSR recommended a 120-month custodial sentence[2] followed by a 5-year term of supervised release, a $10,000 fine, and a $200 special assessment (*Id.* at ¶¶ 92-99, 101-103.)

Defendant filed a motion for new trial on January 12, 2022. (ECF No. 68.) The Court heard argument on March 28, 2022 and denied the motion following an evidentiary hearing on July 8, 2022. Sentencing is currently set for August 19, 2022.

## III.
## STATEMENT OF FACTS

Having witnessed the two-day trial and post-trial evidentiary hearing, the Court is familiar with the facts of this case and summarized below.

### A. Defendant Is Caught Smuggling Controlled Substances at the Port of Entry

On August 9, 2020, U.S. Customs and Border Protection Officers ("CBPOs") stopped Defendant's car at the Calexico East Port of Entry. Defendant was the driver and registered owner of the highly modified 2016 Ram 3500. Defendant's adult daughter and son were passengers in the truck. The CBPO at primary referred Defendant and the truck to secondary inspection as it was too high for proper inspection.

---

[1] The PSR declined to recommend a two-level Safety Valve reduction on the basis that the Government had not yet confirmed whether or not Defendant had met the fifth criterion under U.S.S.G. § 5C1.2. The Government had not received a proffer letter at the time of the PSR's completion.

[2] The PSR did not include a conditional sentencing recommendation if Defendant satisfied safety valve criteria.

At secondary inspection, a CBPO utilized the Z-Portal machine to scan the truck and observed anomalies in the speaker box in the bed. A canine enforcement officer and his Narcotics Human Detector Dog ("NHDD") also conducted a search of the truck when the NHDD alerted and responded to the presence of narcotics in the speaker box. During further inspection, a CBPO opened the speaker box revealing a large compartment that contained a total of 172 packages. 169 of the 172 packages contained a white crystalline substance that field-tested positive for methamphetamine. The other three packages were different in size and contained a blue, powdery substance in the form of pills, which field-tested positive for fentanyl. Subsequent testing by DEA forensic chemists revealed the packages contained 88.90 kilograms (195.58 pounds) of pure methamphetamine and 3.63 kilograms (7.99 pounds) of fentanyl.

B. **The Truck's Significant Modifications and Vehicle Expert Opinion**

Homeland Security Investigations Special Agents (SAs) were notified of the incident and responded to the Port of Entry. The assigned case agent, SA Doucet, further examined the truck and discovered a Snap-on Cordless Rachet tool with a socket affixed to the rachet head on the floorboard of the right rear passenger seat. When he placed this socket on the rear seat bolt, he noted a correct fit. SA Doucet noted no other rachets or sockets in the cab of the truck. He then discovered a large cut-out in the rear wall of the truck that was accessible from behind or underneath the rear seat. This cut-out led to another opening, cut into the bed of the truck. The two openings were joined together with a rubber gasket and allowed access to the speaker box in the bed of the truck. The HSI SAs met with Defendant following his arrest. Following advisal of his *Miranda* rights, Defendant invoked his right to an attorney and did not make a

statement.[3]

The United States retained a vehicle expert who later inspected the truck and confirmed that the rear of the truck cab and front panel of the truck bed were modified in order to add an opening to the rear mounted speaker box. The opening measured approximately 28 inches in width and was 9.5 inches tall. A three-to-four-inch rubber gasket was used between the cab and the bed to seal out the outside elements.

In addition to a lift kit, aftermarket suspension, and lighting systems, the vehicle expert further found that the truck's in-dash stereo was replaced with an aftermarket replacement system, aftermarket subwoofer, aftermarket speaker box, and aftermarket amps. Even though all the necessary wiring was present, the expert opines that the packages of drugs very tightly packed into the speaker box would have greatly hindered the use of the speaker, limiting the sound quality, and would have been noticeable at any volume. Furthermore, the drug packages were enclosed between the outer walls of the speaker box and the back of the speakers. There were no exterior openings to the speaker box to offer easy access, indicating that the packages were implanted when the speakers were removed through the opening of the rear cab panel.

C.   **Drug Results and Value**

Testing by DEA forensic chemists revealed the seized drugs consisted of 88.9 kilograms (195.58 pounds) of pure methamphetamine and 3.63 kilograms (7.99 pounds) of fentanyl, quantities intended for distribution rather than personal use. The street value of that quantity of methamphetamine in Southern California is estimated at approximately $1,320,000 and the value of fentanyl $363,000.

---

[3] Contrary to the assertion in the PSR (PSR ¶ 7), Defendant's passenger daughter did make a statement to agents following Defendant's arrest that was summarized in the initial ROI (Bates 65-68). That statement was not used at trial or referenced during the July 8, 2022 evidentiary hearing.

D. **Defendant's Cell Phone**

CBP Officers seized one cellphone from Defendant at the time of his arrest. Agents attempted to download the contents of Defendant's cellphone per a search warrant, but were not able to extract a full download of its contents.

E. **Defendant's testimony at trial**

At trial, Defendant took the stand and testified that he spent the weekend visiting his parents in Mexicali.  Trial Transcript Volume 2, ECF No. 69 at 24-45.  He testified that he left his home in Lakewood, California and arrived at his parent's home in Mexicali on Saturday morning with his kids. *Id.* at 28:10-14.  While driving to Mexicali, he indicated that the speakers were not working properly, and that his brother Javier suggested the speakers could be fixed "over there," so they left them alone for the trip. *Id.* at 30:16-25.  Once in Mexicali, they drove around looking for fountains and parts for Javier's truck.  Around 4:00 pm, Defendant and Javier dropped off his truck at an unknown, unspecified audio shop in Mexico and was told to pick it up a couple hours later.  He indicated that the rear seats had to be removed to access the amplifiers. *Id.* at 33:9-13.  While the truck was at the audio shop, Defendant indicated the family was preparing dinner and that he, his dad and his son got haircuts. *Id.* at 33:22-34:3.  Defendant testified that he picked up the truck more than two hours after dropping it off as it was getting dark.  When asked if Defendant called to see if the truck was finished, he indicated "No, I just went.  He said two hours, and it was more than two hours." *Id.* at 34:4-12.  He additionally testified throughout direct and cross examination about his work as a welder and fabricator through various jobs, which explained the presence of tools and equipment under the locking cover on the bed of his truck.  On cross examination, Defendant indicated that he inspected the work on his truck done by the audio shop, specifically stating "[t]hey showed me the amplifier next to it." *Id.* at 43:18-23.  He testified that he tested the sound and left to go eat with his family and did not know about the narcotics contained inside.

The jury did not buy Defendant's story. Rather, the jury convicted him on both counts of the indictment.

F. **Defendant's Post-Arrest Jail Calls**

While not introduced at trial, both the Defendant and the United States admitted transcriptions of portions of Defendant's jail calls that occurred during his incarceration both following his arrest and after the trial. Exs. 1 and 2 (admitted as Exs. 6 and A during the hearing, ECF No. 84). In a call with his girlfriend the day after his arrest, Defendant reminds her he "can't tell [her] much over the phone" and then follows up with "uhm, listen to me…they already are aware of that. They have it…under control," and then indicates that Javi and Sasha are there. Ex. 1 at 10:15-25. That same day, Defendant speaks to his father and immediately starts talking in what appears to be coded language regarding keys and "shoes" that are likely cars as follows:

| | |
|---|---|
| Defendant: | Hello. |
| Father: | Hello. What's up? |
| Defendant: | What's up, father? |
| Father: | Good, good. |
| Defendant: | How are you doing? |
| Father: | Here we are busting our asses. |
| Defendant: | Mmh. |
| Father: | But, uhm, there was…we were there dealing with the *keys for the grey one*, but we're done… |
| Defendant: | Okay. |
| Father: | …But now we will get it fixed tomorrow. We are going to buy what it needs so that we can use it again. |
| Defendant: | Okay. Perfect. |
| Father: | Uhm… |

*Id.* at 14:20-15:4 (emphasis added). Defendant and his father then talk about several individuals and whether Defendant has called them yet. Defendant's father mentions "[t]hey gave me your number and Javi told him that we were having a few personal

problems" *Id.* at 15:5-16.  The apparent coded language involving the keys and shoes then continues as follows:

| | |
|---|---|
| Defendant: | Right? So, on the 13th then… So, uhm…so you have already put on the gray shoes? |
| Father: | Yes, already, I have. |
| Defendant: | Hey, and did the white ones fit you? |
| Father: | What was that? |
| Defendant: | The white ones? |
| Father: | The white ones? They are already at my mom's. |
| Defendant: | Oh, okay. The white shoes? |
| Father: | Yes. |
| Defendant: | Okay. Perfect. |
| Father: | Javi…Javi took them. |
| Defendant: | And…uh…the -the little one? The little moon? |
| Father: | Uhm…is it going to be, it's going to be - it's going to be in this one, along with the box. |
| Defendant: | Okay. Perfect. |
| Father: | And the ones – the ones in the little boxes as well. |
| Defendant: | Okay. Right on. No, well, give it your best. |
| Father: | Is there anything -anything else that is needed from here, from the house?  Was that all, was that all you had here? The …the…[unintelligible]? |
| Defendant: | [overlapping] Yes, Yes. Uh…what was I going to tell you? Ah… Uh…well, the stuff that's in my closet, dude. |
| Father: | [overlapping] Yes. We are going to put that also – we are going to put it in boxes. That can be delivered in the -in the [unintelligible]. |
| Defendant: | Okay. Perfect. Yes, there it is…[unintelligible] |
| Father: | [overlapping] We are going to – we are going to put everything together in a bunch, everything, all the -all the important stuff. |
| Defendant: | Everything you can. Right one, buddy, take care of that. I'll call you tomorrow. [discussion continues] |

*Id.* at 16:11-17:15.  Defendant inquires whether his girlfriend's purse is there and whether the vehicle "she drives" is there, specifying a Wrangler.  Defendant then speaks to Javi directly in the following exchange:

| Defendant: | Tell Javi that – that- to go… |
|---|---|
| Father: | [overlapping] Do you want to talk to him? |
| Defendant: | Hand Javi the phone. |
| Javi | Hey. |
| Defendant: | What's up, dude, how are you? |
| Javi | Good, well, you know, whatever needs to be done. |
| Defendant: | Okay, buddy, thank you very much. Um…if you could throw… |
| Javi | Yesterday – yesterday, I – I brought them and took the car while I was at it. |
| Defendant: | [overlapping] No, shh! |
| Javi | [overlapping] [unintelligible] …one run. |
| Defendant: | [overlapping] You can't, you can't about anything like that. Hey… |
| Javi | Mmm. |
| Defendant: | If you get a chance, please…um…talk to [name]. |
| Javi | Mmj. |
| Defendant: | And [tell him] to tell [name]. |
| Javi | Oh, yes, no. That is -is already taken care of. |
| Defendant: | Also so – so – that he lends a hand as well. |
| Javi | Yes, no. Just, what's his name? Wants to know if he should call the man that cuts the grass to tell him not to come. |
| Defendant: | Uh-huh. |
| Javi | To not go to buy the grass that he was going to do over there. |
| Defendant: | Yeah. |
| Javi | To tell him not to come. Okay? |
| Defendant: | All right, buddy. |

*Id.* at 20:3-28.  In another call several days later on August 11, Defendant, Javi, and Defendant's girlfriend start to discuss Defendant's "run" as follows:

| Girlfriend: | I put them by twos for you, they went in pairs, uh?, because there were no rubber bands |
|---|---|
| Defendant: | Excuse me? |
| Girlfriend: | There were 5… |
| Javi: | [overlapping][unintelligible] You had 5 there in -in …in the [unintelligible] |
| Defendant | What ws that?  Uh, I can't… |
| Javi: | Were there 5, five in that run? |
| Defendant: | Uh, I can't talk about anything. |
| Javi: | Well…uh -uh -uh -the [unintelligible] I already took them all the way there. |

*Id.* at 33:25-34:6.  After some discussion about going "to the office in the morning" and driving back and forth, Defendant reminds Javi that "we can't be talking about those things over the phone." *Id.* at 35:9-19.

A general review of Defendant's jail calls following the trial in early December are applicable as to the timing of the family meeting on December 6, 2021 where Javi allegedly confessed to planting the drugs in Defendant's truck.  Defendant's Post Trial Jail Calls, Ex. 2.  But turning to assessing Defendant's eligibility for safety valve, the United States turns to a jail call where Defendant discussed the events on the date his truck was at the stereo shop just before his arrest.  Specifically, Defendant indicated that when Javi "came back from getting his hair cut, he was all sweaty, fool.  When he told me the pickup was ready. He said they were going to take it to the stereo place and he was all sweaty when he got here.  That supposedly he'd gone to get his hair cut." Ex. 2 at 11:17-23.

G.  **Defendant's Safety Valve Proffer**

Defendant provided a proffer letter via counsel on July 15, 2022.  That letter was provided to the Court in Defendant's filings.

//
//

# IV.
# POINTS AND AUTHORITIES

## A. Defendant is Subject to a Mandatory Minimum 10 Years and Maximum Life in Prison

Defendant was convicted of the importation of methamphetamine and fentanyl, in violation of 21 U.S.C. §§ 952 and 960. He is subject to a maximum sentence of life in custody and a mandatory minimum of 10 years in custody.

## B. Sentencing Guidelines

The United States submits the following Guideline calculations:

1. Base Offense Level [USSG § 2D1.1(c)(1)]                         38
2. Importation of Methamphetamine [USSG §2D1.1(b)(5)]   +2
3. Safety Valve [USSG § 2D1.1(b)(17)]                                0

**Final Offense Level                                                    40**

Criminal History Category:                                              I

Range:                                                            292-365 months

## C. Safety Valve

**1. A defendant must provide a truthful and complete disclosure to receive the safety valve reduction.**

The Sentencing Guidelines allow for a two-level decrease in the offense level if a defendant meets the criteria for Limitation on Applicability of Statutory Minimum Sentences in Certain Cases, also known as "safety valve." U.S.S.G. § 2D1.1(b)(17).

The criteria for safety valve criteria is as follows:

(i) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines before application of subsection (b) of [U.S.S.G.] § 4A1.3 (Departures Based on Inadequacy of Criminal History Category);

(ii) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(iii) the offense did not result in death or serious bodily injury to any person;

   (iv) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in continuing criminal enterprise, as defined in 21 U.S.C. § 848; and

   (v) not later than the time of the sentencing hearing, the defendant has truthfully provide to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

U.S.S.G. § 5C1.2(a)(1)–(5). The defendant bears the burden of proving safety valve eligibility by a preponderance of the evidence. *United States v. Mejia-Pimental*, 477 F.3d 1100, 1104 (9th Cir. 2007). "The initial burden is incontestably on the defendant to demonstrate by a preponderance of the evidence that he is eligible for the reduction." *United States v. Shrestha*, 86 F.3d 935, 940 (9th Cir. 1996) (citing *United States v. Howard*, 894 F.2d 1085, 1089-90 (9th Cir. 1990)). Only if the defendant can make this showing, the burden shifts to the United States to show that the information supplied is "untrue or incomplete." *Id.*

  In order to satisfy the fifth criteria for safety valve, a defendant must "truthfully provide to the Government all information and evidence the defendant has concerning the offense." U.S.S.G. § 5C1.2(a)(5). A defendant who agrees to a proffer, but refuses to answer questions or answers them evasively, has not provided the Government with a truthful, complete disclosure. *See Mejia-Pimental*, 477 F.3d at 1106 (citing *United States v. Washman*, 128 F.3d 1305, 1307 (9th Cir. 1997).

  The fifth prong requires a defendant to disclose information regarding the co-participants in the crime as well as all uncharged relevant conduct that is part of the same course of conduct or part of a common scheme. *See United States v. Miller*, 151 F.3d 957, 960 (9th Cir. 1998); *Shrestha*, 86 F.3d at 939 (defendant must provide "details concerning other parties to the crime"). A defendant must also provide truthful and complete information concerning the immediate chain of distribution of the narcotics. *See United States v. Thompson*, 81 F.3d 877, 878 (9th Cir. 1996) (defendant must "give the Government

all the information he has concerning the offense, including the source of his drugs, to avail himself of the benefit of § 5C1.2."); *United States v. Acosta-Olivas*, 71 F.3d 375, 377-78 (10th Cir. 1995) (the fifth prong requires a defendant to "tell the government all he knows about the offense of conviction and the relevant conduct, including the identities and participation of others"); *United States v. Evans*, 216 F.3d 80 (D.C. Cir. 2000) (safety valve relief denied for defendant who claimed that he did not know the names of the two men who supplied the drugs); *United States v. Gambino*, 106 F.3d 1105, 1112 (2d Cir. 1998) (safety valve relief denied for defendant who claimed that someone he did not know agreed to sell him $60,000 worth of heroin at a nightclub); *United States v. Rodriguez*, 69 F.3d 136, 143-44 (7th Cir. 1995) (safety valve relief properly denied where defendant failed to identify supplier or buyers of narcotics); *United States v. Wrenn*, 66 F.3d 1,3 (1st Cir. 1995) (safety valve relief properly denied where defendant did not provide the government with all of the information and evidence he had concerning the very crime to which he pleaded guilty, including names of customers),

Defendant must provide the Government with complete information regarding the immediate chain of distribution even if the defendant fears reprisal by those in the chain. *See United States v. Tang*, 214 F.3d 365, 371 (2d Cir. 2000) (there is no "fear of consequences" exception to the full disclosure requirement). "In determining whether [the defendant] had been truthful and completely forthcoming with information concerning the offense, the district court could consider information learned from other sources which indicated that [the defendant] had been less than forthcoming." *United States v. Ajugwo*, 82 F.3d 925, 929 (9th Cir. 1996) (affirming the denial of safety valve).

### 2. **Defendant Has Failed to Satisfy the Fifth Prong of Safety Valve Relief Because He Did Not Provide Truthful Or Complete Information**

The Government recommends denial of safety valve relief because Defendant failed to provide a truthful and complete disclosure to the Government as required by the fifth prong of the safety valve provisions under 18 U.S.C. § 3553(f)(5) and USSG § 5C1.2(a)(5).

  Defendant has had a year since the conclusion of his trial to provide the Government with a truthful disclosure regarding his involvement in the offense. But the explanation contained in his letter is simply inconsistent with the evidence. For example, he testified during trial that he "just went" to pick up his truck and that he dropped it off and picked it up from the stereo shop. Trial Transcript, ECF No. 69 at 34:9-12. But in a later jail call following his trial, that narrative shifts. Rather, Defendant indicated that Javier "told me the pickup was ready." Post Trial Jail Calls, Ex. 2 at 11:19-20. He went on further to say that "they were going to take it to the stereo place." *Id*. But this is inconsistent with the previous version where he indicates he dropped off the truck at the stereo shop with Javier and then picked it up. A third version emerges in his proffer where he indicates he messaged Javier asking about the truck inquiring on the status. Javier then returned to the family house and Defendant claims he picked up the truck with Javier. Notably, Defendant indicated in his proffer letter he "tested the stereo and everything was working." But this could not possibly be true if the speaker box was packed with over 200 pounds of narcotics. Additionally, Defendant indicated in his trial testimony that he inspected the amplifier in the truck when he picked it up from the stereo shop. But had he done so, he surely would have noticed the 28x9.5-inch hole cut between the cab and the bed of the truck to provide access to the speaker box inside. This is even more so as Defendant is very experienced in fabrication both in his professional life and his race car hobbies. Moreover, Defendant indicated in his proffer letter that he spoke to a DEA agent and explained what happened over the whole weekend. Not so. Defendant invoked his right to an attorney and did not make a post-arrest statement.

  Putting all these inconsistencies aside, a review of the Defendant's jail calls provided above indicate that this "run" was planned and that he, his father, and his brothers – specifically Javi – had a plan in place in case Defendant was caught. It is nonsensical to discuss keys in a "grey" one, and then turn to discussing grey shoes and white shoes in the aftermath of a seizure and arrest – inquiring whether the shoes fit just after referencing keys to those shoes. And when speaking with Javi just after his arrest, instead of inquiring about

the stereo shop where the narcotics were "planted" in his beloved truck, Defendant reminds his brother to be quiet and not talk about the car and the "run." Then when Javi asks about the man that "cuts the grass" and whether he should come, Defendant instructs him to not "buy the grass that he was going to do over there." Ex. 1 at 20:23-25. While Defendant may have a yard at his home in Lakewood, it is nonsensical that he and his brother would discuss gardening if Defendant's claims that Javier put the narcotics in his beloved truck without his knowledge were true. In sum, this explanation does not square with the evidence.

Defendant is not eligible for Safety Valve because he did not fulfil "a simple duty of 'good-faith effort[s]' to 'provide the government with complete information by the time of the sentencing hearing[.]'" *Mejia-Pimental*, 477 F.3d at 1108 (quoting *Shrestha*, 86 F.3d at 940). U.S.S.G. § 5C1.2 has been uniformly interpreted by the courts as requiring a defendant to provide complete and accurate information regarding the participation of other people in a drug offense known to the defendant, "such as the source who provided defendant with the drugs and other persons in the chain of distribution, if known." *Shrestha*, 86 F.3d at 939 (citing cases from 7th Circuit, 10th Circuit, and 1st Circuit). As a requirement of section (5) of the safety valve provision, Defendant was required to "tell all he can tell." *Id.* (citing *Acosta-Olivas*, 71 F.3d at 378). He failed to do so. Defendant's story continues to evolve in a way that minimizes his own responsibility. In sum, Defendant has not provided all relevant information he has concerning his offense.

### 3. Minor Role

The United States does not recommend a minor role departure in this case because Defendant has not truthfully disclosed his involvement in the offense.

The Sentencing Guidelines allow for a two-level decrease in the offense level if a defendant "was a minor participant in any criminal activity." USSG § 3B1.2(b). "The defendant bears the burden of proving that he is entitled to a downward adjustment based on his role in the offense." *United States v. Cantrell*, 433 F.3d 1269, 1282 (9th Cir. 2006) (citation omitted). To carry this burden, the Defendant must prove by a preponderance of

the evidence that he was "*substantially less culpable* than the average participant." *United States v. Hurtado*, 760 F.3d 1065, 1068 (9th Cir. 2014) (emphasis in the original) (citation omitted); *see United States v. Davis*, 36 F.3d 1424, 1436 (9th Cir. 1994).  The relevant pool for comparison is "all actors who participated" in the "specific criminal scheme" if the court finds "sufficient evidence of their existence and participation." *United States v. Rojas-Millan*, 234 F.3d 464, 473-74 & n.5 (9th Cir. 2000).

The Sentencing Guidelines Commentary explains that "a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under § 1B1.3 only for the quantity of drugs that the defendant personally transported or stored may receive an adjustment under this guideline." USSG § 3B1.2 cmt. n.3(a).  The Commentary also provides a non-exhaustive list of factors for courts to consider when determining whether minor role is appropriate:

   (i) the degree to which the defendant understood the scope and structure of the criminal activity;

   (ii) the degree to which the defendant participated in planning or organizing the criminal activity;

   (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

   (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and

   (v) the degree to which the defendant stood to benefit from the criminal activity.

USSG § 3B1.2 cmt. n.3(c)(i-v).  The Ninth Circuit held that courts "should consider all of the factors" in this non-exhaustive list when determining a defendant's role. *United States v. Quintero-Leyva*, 823 F.3d 519, 523 (9th Cir. 2016).  Additionally, the Ninth Circuit noted that such application of the factors should be flexible, and courts are free to "grant a minor role reduction even if some of the factors weigh against doing so," and "deny a minor role reduction even if some of the factors weigh in favor of granting a reduction." *Id*.

As discussed above, the Defendant has not truthfully disclosed all the information about his involvement in the offense. For this reason, the government is unable to evaluate Defendant's role in the offense. In assessing "whether a defendant should receive a role reduction, 'the defendant is to be compared with the other participants' in the crime, not with a hypothetical average participant." *Quintero-Leyva*, 823 F.3d at 523 (quoting U.S.S.G. App. C. Amend. 794). The amount of drugs concealed in the Defendant's vehicle at the time of his arrest was substantial, which weighs against the Defendant playing a minor role. *See United States v. Davis*, 36 F.3d at 1436-37 (stating that downward adjustment for minor role may be denied where defendant imported a substantial amount of drugs (citing *United States v. Lui*, 941 F.2d 844, 849 (9th Cir. 1991))). Additionally, Defendant had regular and frequent crossings in the load vehicle prior to his arrest.

Given all the above, there is not sufficient evidence to support a finding that Defendant was substantially less culpable than average participant in the crime. Accordingly, the Defendant does not deserve a reduction for his role in the offense.

### 4. **18 U.S.C. § 3553(a)**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citing *Rita v. United States*, 551 U.S. 338, 347-48 (2007)). The sentencing court must then consider all seven factors listed in 18 U.S.C. § 3553(a) to "determine whether they support the sentence . . . ." *Id.* & n.6. The factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the purposes of sentencing; the kinds of sentences available; the sentences and ranges established by the Sentencing Guidelines; relevant policy statements issued by the Sentencing Commission; the need to avoid unwarranted sentencing disparities among similarly situated defendants; and the need to provide restitution to victims. 18 U.S.C. § 3553(a).

The statute instructs that the sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing described in the second factor. 18 U.S.C. § 3553(a). "The fact that § 3553(a) explicitly directs sentencing

courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. at 50 n.6.

Because Defendant failed to satisfy safety valve, his applicable sentencing guideline range is 120 months. The nature and circumstances of the offense are serious, given the charges and the amount and type of narcotics found in the Defendant's truck, but the sentence is well below his Guidelines range. A 120-month custodial sentence is sufficient, but not greater than necessary, to reflect the seriousness of the offense, provide adequate deterrence of such criminal conduct, and promote respect for the law.

## V
## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court impose statutory mandatory minimum 120-month custodial sentence, followed by five years of supervised release, a $200 special assessment, and a $10,000 fine as recommended by Probation.

DATED:  August 18, 2022

Respectfully submitted,

 RANDY S. GROSSMAN
United States Attorney

/s/ *Jennifer E. McCollough*
JENNIFER E. MCCOLLOUGH
Assistant United States Attorney